IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BILLINGS DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | CR 24-131-BLG-SPW |
| vs. | ORDER |
| RACHEL LYNN MEHLING, | |
| Defendant. | |

Before the Court is Defendant Rachel Lynn Mehling's Motion to Suppress. (Doc. 26). Mehling is charged with making a false statement during a firearms transaction under 18 U.S.C. § 922(a)(6). (Doc. 1). Mehling seeks to suppress the statements she made to ATF special agents Matthew Schieno and Brett Claflin on July 19, 2023. (Doc. 27 at 2). Mehling argues that her statements should be suppressed because the ATF agents failed to Mirandize her during their conversation and her eventual confession to the crime was involuntary. (*Id.* at 6–7). The Government responded on April 21, 2025. (Doc. 33). A suppression hearing was held on June 17, 2025, where ATF agent Schieno testified. (Doc. 37). The Court finds the material facts are not disputed based on the parties' briefing, the ATF agents reports, and ATF agent Schieno's testimony.

1

For the reasons stated below, the Court denies the motion.

## I.    Background

On March 18, 2023, at around 5:00 p.m., Ian Ickes was denied by the National Instant Criminal Background Check System (NICS) from buying a Glock, model G19, 9mm caliber, pistol from Scheels in Billings, Montana. (Doc. 33-1). About three hours later, Mehling entered Scheels and purchased a different Glock 19 pistol. (Doc. 33 at 2). Scheel's Loss Prevention Associate, Kiley Bradley, noticed that Mehling and Ickes resided at the same address, 4414 Jayhawks Way #6, in Billings. (*Id.*). On March 20, 2023, Bradley emailed Agent Claflin that the transaction may have been a straw purchase for Ickes. (Doc. 33-1 at 1). Agent Claflin began investigating Mehling and found three Firearm Trace Summaries ("FTS") associated with her. (*Id.* at 2). Based on the FTS, Claflin discovered that Mehling had purchased three firearms that were later recovered at crime scenes between 2020 and 2022. (*Id.*).

On July 19, 2023, Agents Claflin and Schieno conducted a recorded interview with Mehling. (Doc. 33 at 3). The agents were not in uniform, drove an unmarked vehicle to her apartment, parked a distance away, and kept their firearms concealed. (*Id.*). The ATF agents knocked on the door, and after Mehling answered, they informed her they had some questions about her gun purchase on March 18. (*Id.*).

2

Throughout the interview, Mehling's story about the guns continued to change. Initially, Mehling told the agents that she had purchased six guns for herself, kept the guns at her dad's house, and had them for self-defense. (Doc. 27-1 at 5–7). Mehling then told the agents that she had gifted one gun to her roommate, Ickes, and had left another gun in the back of her friend's car, who got arrested. (*Id.* at 7). After the agents confronted Mehling with the fact that three guns she had purchased were recovered at crime scenes, she admitted that she was buying the guns for Ickes. (*Id.* at 24–26). According to Mehling, she and Ickes would go into a gun store, and he would tell her what guns he was interested in. Then, she would purchase them. (*Id.* at 27–29). She admitted that on March 18, Ickes had given her money to buy the Glock 19 for him, but it's unclear whether the other gun purchases involved a "commission" for Mehling. (*Id.* at 29).

Agent Claflin continued the investigation and interviewed Ickes on August 2, 2023. (Doc. 33-3). Ickes was pulled over based on his active felony warrant for Criminal Distribution of Dangerous Drugs. (*Id.* at 1). Ickes informed the agents that he had a firearm in his car and that he had received the firearm from Mehling. (*Id.*). Ickes told Agent Claflin that Mehling purchased two other firearms for him over the last three years. (*Id.*).

On September 19, 2024, Mehling was indicted for making a False Statement During a Firearms Transaction in violation of 18 U.S.C. § 922(a)(6).

## II.    Discussion

Mehling now moves to suppress the statements she made to the ATF agents on March 18, 2023, because the ATF agents failed to Mirandize her, and her eventual confession was involuntary. (Doc. 27 at 6–7). In response, the Government contends that the ATF agents did not create a "police-dominated" atmosphere requiring a *Miranda* warning and that her eventual confession was voluntary. (Doc. 33 at 11, 15).

The Court will first address whether *Miranda* warnings were required during the interview with Mehling and then whether her eventual confession was voluntary.

### A.    *Whether Mehling Was In Custody*

Mehling argues that her confession violated the Fifth Amendment because the ATF agents failed to advise her of her *Miranda* rights. (Doc. 27 at 10). Mehling contends that the discussion in the doorway of her apartment qualified as a custodial interrogation, and therefore, *Miranda* warnings were required. (*Id.*). In response, the Government contends that Mehling's interview did not take place in a "police-dominated" atmosphere and, therefore, the interview never became a custodial interrogation. (Doc. 33 at 11).

A police officer's requirement to give *Miranda* warnings to a suspect before an interview only extends to instances where the person is "in custody." *United States v. Kim*, 292 F.3d 969, 973 (9th Cir. 2002) (citations omitted). In cases where

a suspect has not been taken into formal police custody, a suspect will be considered "in custody" under *Miranda* if the suspect has been "deprived of his freedom of action in any significant way." *Miranda v. Arizona*, 384 U.S. 436, 444 (1966). To determine if the suspect was in custody, courts examine the totality of the circumstances surrounding the interrogation. *United States v. Craighead*, 539 F.3d 1073, 1082 (9th Cir. 2008).

"The usual inquiry into whether the suspect reasonably believed he could 'leave' the interrogation does not quite capture the uniqueness of an interrogation conducted within the suspect's home." *Id.* at 1082. When an interview occurs at the defendant's home, as is the case here, the Ninth Circuit has found that the elements of compulsion that necessitate *Miranda* warnings are less likely to be present because the suspect is in familiar surroundings. *Id.* at 1083. Based on this reasoning, to determine if an in-home interrogation was custodial or not, the Ninth Circuit focuses on the extent "to which the circumstances of the interrogation turned the otherwise comfortable and familiar surroundings of the home into a 'police-dominated atmosphere.'" *Id.* In determining whether the interrogation was transformed into a police-dominated atmosphere, the Court considers (1) the number of law enforcement personnel and whether they were armed; (2) whether the suspect was at any point restrained, either by physical force or by threats; (3) whether the suspect was isolated from others; and (4) whether the suspect was informed that they

5

were free to leave or terminate the interview, and the context in which such statements were made. *Id.* at 1084. The Court addresses each factor in turn.

First, the Court considers the number of law enforcement personnel present at the home and whether they were armed. "The presence of a large number of visibly armed law enforcement officers goes a long way toward making the suspect's home a police-dominated atmosphere." *Id.* at 1085 (The *Craighead* court found the presence of eight law enforcement officers from three different agencies, some of whom unholstered their firearms in the defendant's presence, contributed to a police-dominated environment). Here, the number and appearance of the ATF agents outside Mehling's doorway made the interview environment significantly less imposing than the environment in *Craighead*. Only two agents were present at the scene, and their firearms remained concealed throughout the interview. In addition, the agents never entered Mehling's home and remained at the doorway of her apartment for the duration of the interview. Therefore, this factor weighs against the ATF agents creating a police-dominated atmosphere.

Second, the Court considers whether the ATF agents restrained Mehling at any point during the interview by physical force or by threats. "When law enforcement agents restrain the ability of the suspect to move – particularly through physical restraints, but also through threats or intimidation – a suspect may reasonably feel he is subject to police domination within his own home and thus not free to leave or

terminate the interrogation." *Id.* (citations omitted); *see United States v. Blanford*, 467 Fed. Appx. 624, 625 (9th Cir. 2012) (officers created a police-dominated atmosphere when they threatened the defendant with criminal charges if he did not cooperate). Mehling was not handcuffed or physically restrained, and she was allowed to freely retreat into her apartment to look for the gun she allegedly purchased for her roommate. When Mehling went to look for the gun, both ATF agents remained in the doorway of her apartment. Further, there were no threats of arrest or general intimidation used by the agents against Mehling. Therefore, this factor also weighs against the ATF agents creating a police-dominated atmosphere.

Third, the Court considers whether Mehling was isolated from others during the police interview. "A frequently recurring example of police domination concerns the removal of the suspect from the presence of family, friends, or colleagues who might lend moral support during the questioning and deter a suspect from making inculpatory statements…" *Craighead*, 539 F.3d at 1087 (quoting *United States v. Griffin*, 922 F.2d 1343, 1352 (8th Cir. 1990)). Here, this factor does not weigh heavily in the custody determination because when the agents questioned Mehling, she was alone at her apartment, getting ready to leave for work. There was no one to isolate Mehling from that would contribute to a police-dominated atmosphere. Further, the situation is far different from *Craighead*, where police officers sequestered the defendant into a back storage room, and an armed officer

7

wearing a raid vest was blocking the closed door. *Id.* at 1086–87. Here, the ATF agents stood in the doorway of the open apartment as they interviewed Mehling. Therefore, though this factor is given little weight based on the circumstances of Mehling's interview, it weighs against the ATF agents creating a police-dominated atmosphere.

Last, the Court considers whether the suspect was informed that the questioning was voluntary and that they were free to leave or terminate the interview at any time. "If a law enforcement officer informs the suspect that he is not under arrest, that statements are voluntary, and that he is free to leave at any time, this communication greatly reduces the chance that a suspect will reasonably believe he is in custody." *Id.* at 1087 (citations omitted). "The *Miranda* test for custody does not ask whether the suspect was *told* that he was free to leave; the test asks whether 'a reasonable person [would] have *felt* he or she was not at liberty to terminate the interrogation and leave.'" *Id.* (quoting *Thompson v. Keohane*, 516 U.S. 99, 112 (1995)).

The ATF agents never told Mehling she was free to leave or terminate the interview at any time. The closest the agents came was when they told Mehling, "If you'd like to be honest with us, now is the time. If not, we can always come back later and have another conversation. And the second time is not going to be as friendly and it's not going to be giving you the benefit of the doubt." (Doc. 27-1 at

8

23).  While it was implied that Mehling could terminate the interview, it was accompanied by a warning that the agents would return for further, more aggressive questioning.  Therefore, this factor weighs in favor of finding the interview occurred in a police-dominated atmosphere.  However, this factor is not determinative of the *Miranda* warning inquiry, as the court in *Craighead* made clear, a failure to inform a defendant that they are free to leave is only one factor in the totality of circumstances.

Considering the totality of the circumstances, the ATF agents did not create a police-dominated atmosphere during Mehling's interview.  The circumstances are far different from *Craighead*, where eight officers entered the defendant's home, unholstered their firearms, and led him into a secluded room where an armed officer guarded the exit.  In contrast, here, only two agents were present, and they remained in the doorway of her apartment.  The agents were in plain clothes and kept their weapons concealed throughout the encounter.  Critically, the agents did not use any physical or verbal threats and made no attempts to restrain Mehling.  Mehling's ability to freely retreat into her home to search for the guns exhibits the lack of force and restraint utilized by the agents.  Under these circumstances, the ATF agents did not create a police-dominated atmosphere, and *Miranda* warnings were not required.

B.    *Whether Mehling's Statements Were Voluntary*

Alternatively, Mehling argues that she made her statements involuntarily because her will was overborne by the circumstances of the interview. (Doc. 27 at 7). In response, the Government contends that the circumstances of the interview do not support a finding of coercive police conduct, as the interview was relatively short, conducted in public view, and did not involve any physical restraint. (Doc. 33 at 17).

In determining the voluntariness of a confession, courts examine whether the circumstances of the interrogation overbore a defendant's will. *Doody v. Ryan*, 649 F.3d 986, 1008 (9th Cir. 2011). To be voluntary, a confession must be "the product of a rational intellect and a free will." *United States v. Tingle*, 658 F.2d 1332, 1335 (9th Cir. 1981) (quoting *Blackburn v. Alabama*, 361 U.S. 199, 208 (1960). A confession is involuntary if it is coerced through physical intimidation or psychological pressure. *United States v. Haswood*, 350 F.3d 1024, 1027 (9th Cir. 2003). "A confession accompanied by physical violence is *per se* involuntary, while one accompanied by psychological coercion is not." *Id.*

Here, no evidence indicates that the ATF agents utilized physical violence against Mehling. Thus, in alleged psychological coercion cases, such as this one, the Court looks to the totality of the circumstances surrounding the statements at issue. *United States v. Miller*, 984 F.2d 1028, 1031 (9th Cir. 1993). Courts often

consider the following factors: the defendant's age, their intelligence, the lack of advice regarding the suspect's constitutional rights, the length of detention, and the use of punishments such as deprivation of food or sleep. *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973).

At the time of the interview, Mehling was 23 years old and did not suffer from any condition that impaired her mental capacity, preventing her from comprehending the questions asked during the interview. *See United States v. Preston*, 751 F.3d 1008, 1020 (9th Cir. 2014) (finding that the defendant's reduced mental capacity and age, 18 years old with an IQ of 65, was a critical factor because it made him more susceptible to subtle forms of coercion).

Further, the duration of the interview, approximately 39 minutes, was relatively brief compared to cases where the length of detention rendered the confession involuntary. *See Doody*, 649 F.3d at 1009 (thirteen straight hours of interrogation was a contributing factor in finding the defendant's confession involuntary); *Davis v. State of N.C.*, 384 U.S. 737, 752 (9th Cir. 1966) (repeated questioning over sixteen days was a contributing factor in finding the defendant's confession involuntary).

Additionally, when the agents accused Mehling of lying about her reasons for purchasing the guns, it did not automatically render the questioning coercive. As the Ninth Circuit has held, "an interrogator can legitimately express his disbelief at

a defendant's story in order to elicit further comments or explanations." *United States v. Wolf*, 813 F.2d 970, 975 (9th Cir. 1987). Here, it was fair to question Mehling's reasoning for purchasing the guns because her explanation contradicted itself. She told the ATF agents that she had bought six guns for self-defense yet kept the guns at her dad's house. It was reasonable for the agents to question Mehling's story because it defies common sense to purchase multiple firearms for self-defense and then store them at another individual's house.

The only factor indicating involuntariness is the agent's failure to advise Mehling of her constitutional rights, specifically her right to remain silent and to have an attorney present. *See Davis*, 384 U.S. at 740–41 ("[T]hat a defendant was not advised of his right to remain silent or of his right respecting counsel … is a significant factor in considering the voluntariness of statements later made.").

However, viewing the interview in its totality, the Court cannot find that Mehling's will was overborne. Mehling was at her apartment for the duration of the interview, a familiar environment. The interview itself was relatively short, and the agents did not utilize any psychological manipulation except for accusing Mehling of lying. This accusation was based on the incredulous nature of Mehling's explanation for purchasing the guns at issue, and it was well within the purview of the agents to question her story. Considering the totality of the circumstances surrounding the interview, Mehling's eventual confession was voluntary.

## III. Conclusion

For these reasons, the Court finds law enforcement did not violate Mehling's constitutional rights when they interviewed her at her apartment without providing *Miranda* warnings.  In addition, her eventual confession was voluntary and not the result of law enforcement overbearing her will.  Therefore, the statements made to the ATF agents during the interview at Mehling's home are admissible.

IT IS HEREBY ORDERED that Defendant Rachel Lynn Mehling's Motion to Suppress (Doc. 26) is DENIED.

DATED this _26_ day of June, 2025.

SUSAN P. WATTERS
United States District Judge